**13-2267 TJS**

___FILED ___ENTERED
___LODGED ___RECEIVED

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

OCT 0 4 2013

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

I, Christos Rigakos, being duly sworn, depose and state as follows:

1. Affiant is a US Postal Inspector employed with the United States Postal Inspection Service, currently assigned to the District of Maryland and to the District of District of Columbia, with over fourteen years of federal law enforcement experience, duly appointed according to law and acting as such.

### Search Warrant

2. Affiant also makes this Affidavit in support of Search Warrant Application for:

   **A residence located at 1918 Gardenia Ct. Odenton, MD 21113, which is in the Northern District of Maryland, further described as three story townhome. The townhome has four windows in the front, a bay window, and a brick façade. The front door is blue-gray in color, with a side light on the left, with white trim. The outside light is on the right side of the door. The windows have red shutters, and the bay window is left of the door with white trim. There is a tree blocking a portion of the bay window. In front of the tree there is an ADT sign. The townhome has a white picket fence. There is a utility shed in front of the townhome with light brown siding. On the right side of the utility shed the numbers "1918" are located.**

3. Affiant has probable cause to believe that the items described in the attached property list will be found within the premises. Affiant also believes that said property constitutes evidence of the commission of federal criminal offenses, namely, Title 21, United States Code, Section 841(a)(1) and 846 of the Controlled Substances Act, to wit: unlawful distribution of a controlled substance and conspiracy to distribute and violations of 18 U.S.C. §§ 1956 and 1957, Money Laundering and Conspiracy to Commit Money Laundering. Said property constitutes contraband, the fruits of the above criminal offenses, items otherwise

1

criminally possessed, or property designed or intended for use or which is or has been used as the means of committing the above criminal offenses.

**Affiant's Experience**

4. Affiant has been a United States Postal Inspector for twelve years. During that time, Affiant has worked on numerous federal criminal investigations. Affiant has worked with other agents, police officers, and law enforcement personnel who have extensive criminal investigative experience and training.

5. Affiant was a Special Agent for the US Department of Veteran Affairs, Office of Inspector General, Criminal Investigation Division for two years. During that time, Affiant worked numerous violations of federal laws and conducted investigations accordingly. Affiant has conducted investigations which involve drugs, fraud, and violent crimes.

6. Through training and participation in criminal investigations, Affiant has become familiar with and has participated in the following methods of investigations, including, but not limited to, electronic surveillance, visual surveillance, questioning of witnesses, and the use of search warrants and undercover agents. In the course of such investigations, Affiant has made numerous arrests.

**Knowledge Regarding Drug Trafficking Crimes and Related Crimes, Generally:**

7. Based upon the Affiant's training, experience and participation in other drug investigations involving wholesale and retail amounts of Controlled Dangerous Substances, as well as the knowledge and experience of other agents and police officers with whom your Affiant has worked, your Affiant knows:

   a. That large-scale drug traffickers generate large amounts of currency from the drug trafficking activities and must have access to large amounts of currency to maintain and finance their on-going drug business. Large-scale drug traffickers often conceal this currency and drugs in locations such as their residence, businesses, safe deposit boxes, safes, or other locations where

assets can be concealed. These locations may be in the name of the drug trafficker or in the name of relatives or close associates.

      b.      That in order to conceal profits from their drug trafficking activities drug traffickers often rent, purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by law enforcement authorities. That even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets, and exercise dominion and control over them.

      c.      That it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them, including their residences, businesses, vehicles, storage units and/or other locations over which they maintain dominion and control.

      d.      That it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of drug proceeds, such as: currency, financial instruments, precious metals, and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements, and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the drug traffickers within their residences, vehicles, businesses, storage units or other locations over which they maintain dominion and control.

      e.      That large-scale drug traffickers often utilize electronic equipment such as cell phones, computers, telex machines, facsimile machines, text messaging devices, email, currency counting machines, and telephone answering

machines to generate, transfer, count, record and/or store the information described above.

  f. That large-scale drug traffickers often attempt to legitimize their profits from drug trafficking through various money laundering methods. To accomplish these goals, drug traffickers utilize methods including but not limited to, domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations, and business fronts, and otherwise legitimate cash producing businesses.

  g. That the sale of controlled substances generates large quantities of United States currency in small denominations (commonly referred to as street money). It is common for drug dealers to physically handle and count the street money after receiving it in exchange for the Controlled Dangerous Substances, thereby leaving trace residue of Controlled Dangerous Substances on the street money. Law enforcement agencies utilize dogs which are trained to detect and react to the odor of Controlled Dangerous Substances and residue of Controlled Dangerous Substances and those trained dogs have reacted to drug tainted currency negotiated at banks and concealed in the residences of drug traffickers. It is common for drug dealers to separate their street money by denomination and put this currency in banded stacks in varying increments to facilitate quick counting. Courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and drug transactions;

  h. That the currency transaction reports which are required to be completed and filed by financial institutions and businesses on every currency transaction which exceeds $10,000, causes tremendous problems for drug traffickers when they attempt to negotiate their illegal profits at financial institutions or businesses. In order to avoid the filing of a currency transaction report, drug traffickers often structure their currency transactions, that is, arrange a cash transaction exceeding $10,000 into smaller transactions so that no one

transaction exceeds $10,000, or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

   i. That businesses engaged in the sale or lease of vehicles are required to file currency transaction reports for cash transactions which aggregate over $10,000. These businesses at times generate and/or accept large amounts of currency in the ordinary course of business. Certain of these businesses attempt to conceal the receipt of this currency by failing to file currency transaction reports or by structuring deposits of currency at financial institutions. Drug traffickers and others involved in criminal activity at times seek out businesses that fail to file currency transaction reports.

   j. That drug traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local law enforcement agencies. In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year, which they feel, can be traced and documented by the government. The source of their income reported on these returns is usually falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their residences and businesses.

   k. That drug traffickers commonly maintain cellular phones, computers, text messaging devices, books or papers which reflect the names, telephone numbers, addresses and/or electronic email addresses of their criminal associates in the trafficking organization;

   l. That wholesale quantities of powder drugs such as methamphetamine and cocaine are bought and sold in high purity form, so as to yield a maximum profit and to make the most efficient use of storage space. However, such drugs are not consumed by end users in such high purity form. Rather, such powder drugs, when ultimately consumed by the user, are at a lower purity level or form. High purity powder drugs are reduced in purity by the addition of adulterants such as mannitol, mannite, vitamin B12, baking soda and other such adulterants. This process of diluting pure drugs for sale is commonly

called "cutting" or "stepping on" or "whipping" the drug. Other equipment, such as weight scales, sifters, grinders, electric blenders, razor blades, glass panes, beaters and mirrors, and the like are typically used in this adulterating process.

    m.    That it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia including paraphernalia used in the cutting, weighing, cooking and packaging of controlled substances, in the locations which they maintain dominion and control over, and/or other locations where they conduct their criminal activity.

    n.    That drug traffickers take or cause to be taken photographs and videos of themselves, their associates, their assets and their product. That these traffickers usually maintain these photographs and videos in their possession, or within their residences, computers, cellular phones, vehicles, and/or other locations over which they maintain dominion and control;

    o.    That drug traffickers keep in their residences and/or other locations over which they maintain dominion and control items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

    p.    That it is generally a common practice for drug traffickers to maintain in their residences and/or other locations over which they maintain dominion and control records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records (drug ledgers) to show balances due for drugs sold in the past ("pay"), and for payments expected ("owe") as to the trafficker's supplier and the trafficker's dealer(s). Additionally, drug traffickers must maintain telephone and address

listings of clients and suppliers, and keep them immediately available in order to efficiently conduct their drug trafficking business.

      q.      That it is a generally common practice for drug traffickers to make use of wire transfers, cashier's checks, and money orders to pay for expenses associated with services to facilitate their illegal activities. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in a trafficker's residence and/or other locations over which they maintain dominion and control.

      r.      That typically, drug traffickers possess firearms and other dangerous weapons to protect their profits, assets, illegal drugs, and/or their person from others who might attempt to forcibly take the traffickers' drug profits, assets and/or supply of drugs.

      s.      That drug traffickers often travel or pay and arrange for others to travel in furtherance of their drug trafficking activities including traveling to transport drugs and to transport currency derived from and/or related to the drug trafficking activities. Such travel necessarily results in the generation of various travel documents for the traveler, which typically are also kept in their residences, other locations which they maintain dominion and control and vehicles. In addition, traffickers who travel or who contract others to travel on their behalf often communicate with their sources of supply prior to, during and after their travel. Drug Traffickers typically leave records of these communications in various places including but not limited to their cellular telephones, computers, text messaging devices, telephone answering machines, and handwritten notes. These communication records are usually found in a trafficker's residence, stash location, place of business and/or their vehicles.

      t.      That drug traffickers may use "specific" residences to cook, package, and distribute drugs from a residence which is not owned, operated or under their immediate control. This is done to attempt to prevent law enforcement from being able to associate a specific drug trafficker with a specific

residence. This is done to attempt to place a barrier between the actual trafficker and the co-conspirator/subject who actually owns the residence in question.

    **u.**    That drug traffickers use "stash" or "cook" houses to conduct illicit activities, such as cooking cocaine into crack cocaine, stashing illicit drugs, distributing numerous quantities of drugs and conducting illegal activities related to the illicit drug trade. These "stash" or "cook" houses are used primarily to defeat or deter law enforcement from identifying the specific residence owned by the drug trafficker in order to keep law enforcement from conducting operational activities such as surveillance and/or executing search warrants at the drug trafficker's primary residence.

### The Investigation

8.    On September 10, 2013, US Postal Inspectors in Laredo, TX had a total of nine suspect packages. A summary of relevant information obtained during the investigation is as follows:

    a. On September 10, 2013, the Zapata Post Office, Zapata, TX referred nine packages to US Postal Inspectors in Laredo, TX. Three packages were addressed for delivery in Washington, DC, two other packages were addressed for delivery in St. Louis, MO, and four of the nine packages were searched and found to contain a total of approximately 20 pounds, or 10 kilograms, of cocaine.

    b. On September 13, 2013, US Postal Inspectors in Laredo, TX referred the three packages addressed for delivery in Washington DC to Postal Inspectors of the Washington Division.

    c. On September 16, 2013, US Postal Inspectors retrieved the three packages addressed for delivery in Washington DC from the Linthicum Heights Post Office, Linthicum Heights, MD. Postal Inspectors requested the assistance of Detective David McCarthy, Maryland State Police narcotics canine handler and his canine "Ace" to conduct a scan of the three parcels at the Incoming Mail Facility, Linthicum Heights, MD. Detective McCarthy informed US Postal

Inspector Christopher Callahan that "Ace" alerted on all three parcels which were hidden among other boxes.

d. On September 16, 2013, US Postal Inspector Christos Rigakos obtained search warrants for all three packages. One of the packages was addressed to R. Harris at 1617 17th Street, S.E. Apartment #203, Washington D.C., (hereinafter "the package"). US Postal Inspectors searched the package addressed to R. Harris at 1617 17th Street, SE, Apartment #203, Washington D.C., and recovered approximately two kilograms of cocaine. A field test conducted on a portion of the white powder substance contained in the package was positive for cocaine.

e. Later that same day, members of law enforcement conducted an undercover controlled delivery of the package to 1617 17th Street, SE, Apartment #203, Washington DC. An undercover Postal Inspector, posing as a United States Postal Letter Carrier, delivered the package to 1617 17th Street, SE, Apartment #203, Washington DC. When the undercover Postal Inspector was walking in the stairwell of 1617 17th Street, SE, the defendant, later identified as Monte Demond Joyner, opened the front door of apartment #203. The undercover Postal Inspector walked past apartment #203 and was walking toward the next stairwell. The defendant, who was watching the undercover Postal Inspector, asked, "Is that for R. Harris?" The undercover Postal Inspector looked at the package, responded "Yes," and asked the defendant whether he was R. Harris. The defendant replied, "Yes." The undercover Postal Inspector handed the package to the defendant. The defendant signed a delivery receipt. The defendant took the package into apartment #203 and closed the front door to that apartment.

f. As members of law enforcement approached building 1617 17th Street, SE, the defendant ran out of apartment #203 and up the stairwell to the third floor. Unbeknownst to the defendant, he asked another

undercover officer, who was standing on the third floor landing near an apartment door, to let him in, referring to one of the apartments on the third floor. As officers approached the defendant, the defendant began to remove cellular telephones from his pockets and dropped them on the floor. Law enforcement recovered from the floor where the defendant was standing two cellular telephones. The defendant was arrested. The undercover letter carrier positively identified the defendant as the person who identified himself at R. Harris, accepted the package, and signed the delivery receipt for the package. In a search incident to the defendant's arrest, law enforcement recovered approximately $730 in United States currency from his person. In addition, to the currency, law enforcement recovered two US Postal Service receipts dated September 3, 2013 for packages mailed to Laredo, TX. One package was mailed from the Odenton Post Office, Odenton, MD, and the second package was mailed from the Gambrills Post Office, Gambrills, MD. During the search, law enforcement found that the defendant possessed a Class A Maryland Drivers License in the name of Monte Joyner with an address of 1918 Gardenia Ct, Odenton, MD 21113.

g. On September 17, 2013, US Postal Inspector swore to a criminal complaint for Monte Joyner in the US District Court for the District of Columbia. Joyner appeared in front of Magistrate Facciola for his initial appearance. Joyner was detained and a detention hearing was scheduled for September 20, 2013.

h. On September 17, 2013, US Postal Inspectors confirmed from US Postal records that Joyner lives at 1918 Gardenia Ct., Odenton, MD 21113.

**Probable Cause Exists to Search 1918 Gardenia Ct. Odenton, MD**

9. Based on the above described investigation, the Affiant believes probable cause exists that there will be located within the premises described as 1918

Gardenia Ct. Odenton, MD 21113, including the utility shed, evidence, fruits and instrumentalities of violations of Title 21, United States Code, Section 841(a)(1) and 846 of the Controlled Substances Act, to wit: unlawful distribution of a controlled substance and conspiracy to distribute and of violations of 18 U.S.C. §§ 1956 and 1957, Money Laundering and Conspiracy to Commit Money Laundering. Specifically, Affiant believes, based on his training and experience, that there will be instrumentalities of these crimes, specifically listed in the attached property list (Attachment B). Therefore, the Affiant seeks permission to enter the premises including the utility shed and any area inside such premises which could contain these items, in order to search for and recover instrumentalities, fruits and evidence of the aforementioned crimes, as described in the attached property list.

## Conclusion

10. Based on the foregoing and upon his training and experience, the Affiant submits that:

> **That (1) Monte Joyner has violated Title 21, United States Code, Sections 841(a)(1) and 846 of the Controlled Substances Act, to wit: unlawful distribution of a controlled substance and conspiracy to distribute, and has violated 18 U.S.C. §§ 1956 and 1957, Money Laundering and Conspiracy to Commit Money Laundering, and (2) probable cause exists to believe that the premises located at 1918 Gardenia Ct., Odenton, MD 21113, including the utility shed, will contain the instruments and fruits of the crimes named above and as described in Attachment B of this affidavit.**

Christos Rigakos
United States Postal Inspector

Subscribed and sworn to before me on this **19th** day of September, 2013, at **4:51 pm** a.m./p.m.

_[signature]_
The Honorable Timothy J. Sullivan
U.S. Magistrate Judge

## ATTACHMENT "A"

A residence located at 1918 Gardenia Ct. Odenton, MD 21113, which is in the Northern District of Maryland, further described as three story townhome. The townhome has four windows in the front, a bay window, and a brick façade. The front door is blue-gray in color, with a side light on the left, with white trim. The outside light is on the right side of the door. The windows have red shutters, and the bay window is left of the door with white trim. There is a tree blocking a portion of the bay window. In front of the tree there is an ADT sign. The townhome has a white picket fence. There is a utility shed in front of the townhome with light brown siding. On the right side of the utility shed the numbers "1918" are located.

## ATTACHMENT B

### Townhome and Utility Shed located at 1918 Gardenia Ct. Odenton, MD

ITEMS TO BE SEARCHED FOR AND SEIZED:

1. All documents, records and property (whether in the form of printed documents or stored in electronic or digital form) that constitute instrumentalities, fruits, or evidence of the commission of the offenses of Distribution and Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. §§ 841(a)(1) and 846 and Money Laundering and Conspiracy to commit Money Laundering in violation of 18 U.S.C. §§ 1956 and 1957 including but not limited to the following:

a. Buyer lists, seller lists, ledgers, or financial records relating to the purchase, sale, or distribution of controlled substances, and drug paraphernalia including but not limited to scales, grinders, beaters, sifters, pots, dishes, cutting agents, and packaging material.

b. Books, records, receipts, notes, bank statements, and other bank records, money drafts, letters of credit, money orders, cashier's checks, and other monetary instruments, passbooks, bank checks, safe deposit box keys and records, and items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of proceeds from the sale of controlled substances.

c. Income tax returns, W-2 and W-4 forms, receipts, and other documents pertaining to the filing of personal and business tax returns.

d. U.S. currency and currency equivalents such as cashier's checks, traveler's checks, money orders, and bank drafts, or precious metals, diamonds, gemstones, jewelry and other types of valuable items that may be deemed proceeds from drug trafficking and/or involved in the laundering of drug proceeds.

e. Indicia of occupancy, residency, and/or ownership of property including but not limited to canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

f. Papers, tickets, notes, schedules, receipts, and other items relating to domestic or international travel.

g. Photographs in paper or digital form and/or videos of the subjects of the investigation, co-conspirators, assets, or controlled substances.

h. Cellular telephones, pagers, or other electronic devices or documents which reflect names, addresses, telephone numbers, contact information, correspondences, text messages and or emails of subjects of the investigation, their criminal associates, sources of supply, customers, and financial institutions.

      i. Computer desktops, laptops, thumb drives, or any electronic storage device that can store information on money laundering activities and drug activities.